# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

**UNITED STATES OF AMERICA,**

v.   CRIMINAL ACTION NO. 2:18-cr-00077

**BRIAN SCOTT MILLER.**

## SENTENCING MEMORANDUM ON BEHALF OF
## DEFENDANT BRIAN SCOTT MILLER

### I. Introduction.

Pursuant to the Court's Order of June 19, 2018 (ECF No. 18), Defendant Brian Scott Miller, by counsel, files this Sentencing Memorandum. As explained more fully below, this memorandum is primarily directed towards a single portion of the Presentencing Investigation Report prepared and filed by Jeffrey D. Gwinn, Senior U.S. Probation Officer, dated September 27, 2018 (the "Report").

Specifically, Mr. Miller objects to the Section of the Report entitled "Enhancement Pursuant to U.S.S.G. § 3B1.1(c)" on Page 40 (§§ 257 – 261), including the recommendation of a two-level increase in the offense level for Mr. Miller based on the Probation Officer's opinion that he was an "organizer and leader in the instant criminal activity." Both the facts and the law demonstrate that such a conclusion is unwarranted.

As a result, the appropriate offense level for Mr. Miller in this case is 10, which falls within the applicable guideline range of Zone B in the Sentencing Table. In accordance with *Gall v. United States*, 552 U.S. 38 (2007), and applying U.S.S.G. § 5B1.1, the factors set forth in 18 U.S.C. § 3553(a), and other applicable statutes, Mr. Miller submits that a proper sentence would

be to impose probation for a period of twelve (12) months, including home confinement for no longer than three (3) months.

## II. Discussion.

### A. Appropriate Offense Level.

Application Note 4 to § 3B1.1 states, in part:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* The Background section of the Commentary to § 3B1.1 reflects that "[t]he Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." In addition, "[t[he determination of a defendant's role must be made on the basis of all relevant conduct." United States v. Love, 134 F.3d 595, 607 (4th Cir.1998).

Mr. Miller believes that, in light of the weight of the evidence concerning his relevant conduct in this matter, as applied against the factors identified in Application Note 4, Mr. Miller should not qualify as an "organizer and leader" in the criminal activity in this matter.

Per the Report's description of the investigation into the "Relevant Conduct," Keith Dodd, the person "who was asked by Mr. Miller to arrange for the drums to be disposed of" (Report at 22, § 124), stated that he "did not think that Miller was attempting to do anything illegal by sending the drums to Huffman's property." Page 24, ¶ 142. Likewise, Dwayne Huffman, who first received the drums when they left Executive Air, "did not believe Scott

Miller was attempting to do anything illegal" when he told Mr. Dodd to "get rid of" the drums. Report at 14, §57. In fact, it was Mr. Dodd who first contacted Duke Linzy (and other disposal companies) to take the drums from Executive Air, and it was Mr. Linzy who provided the lowest quote for removal. Report at 22, §125. It was Mr. Huffman who asked for the drums to burn in his oil burner – and he wanted to obtain the drums before Mr. Linzy came and got them. Report at 13, § 50; at 14, § 58; at 15, § 65; at 18, § 96. And it was Mr. Dodd who contacted Mr. Linzy to remove the drums from Mr. Huffman's farm. Report at 19, § 98.

These facts reflect that, far from being an "organizer" of the offense, Mr. Miller was merely kept in the loop by his trusted subordinate, Mr. Dodd, who simply agreed to have the drums taken to "a buddy's house" (Mr. Huffman) when Mr. Huffman asked for them. Mr. Miller -- completely ignorant of the illegality of having the drums sent to Mr. Huffman's house -- simply okayed Mr. Huffman's request to take the drums. It was only later, after the drums were taken by Mr. Huffman to his residence, that "Executive Air learned that the removal of the drums from the facility was 'illegal.'" Report at 18, § 97. And, in fact, it was Mr. Miller who later told Mr. Dodd that "'we can't do that' in regard to the giving the drums of waste to Huffman" and who told Mr. Dodd to contact Duke Linzy to retrieve and properly dispose of them. Report at 20, § 106. In short, Mr. Miller was not an "organizer" of such "criminal activity" within the meaning of § 3B1.1(c).

Likewise, Mr. Miller was not a "leader" of the criminal activity. He did not contribute to or direct the accumulation of the waste materials in drums, which came from a variety of sources at Yeager Airport. When he became "'disgusted' by the mess in the garage" left by his former chief mechanic, P.J. Lucas -- and the *storage* of hazardous waste is the only conduct for which Mr. Miller was charged and pleaded guilty -- he requested subordinates to take the necessary

steps to clean up the "mess," which necessarily meant disposal of the drums. As detailed above, however, he left the details and mechanics of the disposal to a subordinate, not knowing that the disposal agreed to by Mr. Dodd and Mr. Huffman was illegal. Given these circumstances, Mr. Miller was not a "leader" of the "criminal activity" within the meaning of § 31B.1(c).

Curiously, the Report depends upon isolated statements from David Katonka and Matt Stevens to support the recommendation of a two-level enhancement. Mr. Katonka, however, "quit Executive Air in May or June 2013" – over 2 years before the events that form the basis for the criminal offense in this case. Report at 28, § 166. Mr. Katonka could not possibly have any relevant information about Mr. Miller's role in events at Executive Air that occurred over two years after he left. Likewise, Mr. Stevens stopped working at Executive Air in February 2015 -- before the events in question occurred – and was "out of work for a long period of time, including the time period in September 2015, in which the drums were removed from Executive Air." That the Report recommends a two-level enhancement under § 3B1.1(c) based upon statements from two individuals who were admittedly not even employed by or around Executive Air when the "criminal activity" occurred is not only curious, it strongly mitigates against the Report's recommendation of the two-level enhancement.

The Information specifically charges *only* that Mr. Miller "knowingly stored, and caused the storage of hazardous waste at the Executive Air facility . . ." from September 17, 2015 to September 18, 2015. Information at ¶ 9. There is no evidence that Mr. Miller, personally, contributed to the collection of hazardous waste at Executive Air, or that he either created or was aware that P.J. Lucas, the chief mechanic at Executive Air, was creating hazardous waste through the mixing of used oil and other materials in the drums. Instead, Mr. Miller was confronted with a problem, i.e., the accumulation of drums, that was not of his creation, and he

directed another Executive Air employee to resolve it. Only when Mr. Miller understood that the first solution (taking the drums to Mr. Huffman's farm) was not proper did he direct that the drums be picked up by Mr. Linzy, who he believed was properly certified to take the drums.

Importantly, Application Note 4 to §3B1.1 states that "[i]n distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling." Here, Mr. Miller was the owner of Executive Air. While he was the "boss" in the sense that he managed and supervised his business and his employees, including Mr. Dodd and Mr. Lucas, he was in no way the "leader" or "organizer" of "criminal activity" – whether that "criminal activity" is that contained in the Information (i.e., storage of hazardous waste) or is "criminal activity" for which Mr. Miller is *not even charged* (i.e., transportation or disposal of hazardous waste).

### B. Appropriate Sentence under the Sentencing Guidelines and 18 U.S.C. § 3553(a).

In deciding upon an appropriate sentence for Mr. Miller's single conviction of storing hazardous waste without a permit, the Court is directed to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the purposes set forth in 18 U.S.C. § 3553(a)(2). 18 U.S.C. § 3553(a)(1). Here, in considering both the circumstances of the offense and Mr. Miller's history and character, one is compelled to conclude that a sentence of probation for twelve (12) months would be a sufficient and entirely reasonable sentence.

As the Report reveals, Mr. Miller has no significant criminal history other than a conviction for driving under the influence at age 24 (a State law conviction that is wholly unrelated to the type of offense involved in this case). As a result, his total criminal history score is zero. Report at 44-45.

Since 1996, Mr. Miller has been the owner and President of Executive Air, providing aeronautical services as the fixed base operator at Yeager Airport, including fueling and other services for private and commercial airplanes. In operating this business, Mr. Miller (through Executive Air) has employed nearly 30 people, with competitive wages and benefits, and thereby provided significant economic benefits to the community.

In addition, Mr. Miller is known as an active supporter of groups whose goals are to promote a better community in Charleston and the surrounding area. [1] He sits on several Boards of Directors of volunteer organizations, and he is Chairman of an organization that is seeking to establish a drug treatment center to deal with the scourge of people addicted to drugs in this area. Report at 34. Almost uniformly, those persons who have worked with him most closely and for the longest periods describe him as a "good person," who has never broken the law or shown any inclination to do so – including some of the very witnesses who provided statements as part of the investigation that led to the criminal charge against him. Report at 14, 24, 34. He also has a history of providing financial assistance to random, destitute or temporality impoverished people in Charleston. Report at 18.

Finally, as indicated by the Probation Officer's recommendation of a two-level decrease in the offense level, Mr. Miller has demonstrated an acceptance of responsibility for the offense to which he has pled guilty. He has also been fully cooperative with the Probation Office and the United States Attorney's Office in all proceedings following his plea.

---

[1] Further evidence of Mr. Miller's character and participation in community activities is found in the April 18, 2018 letter from Charleston resident David H. Wallace, attached as Exhibit 1.

### III. Conclusion.

As the Information only charges Mr. Miller with the illegal *storage* of hazardous waste, and Mr. Miller did not create, organize, or lead the activity to create the hazardous waste, he should not receive a two-level increase in the offense level under § 3B1.1. Even if consideration is given to the transportation and/or attempted disposal of that waste, which is not part of the offense for which Mr. Miller was charged, Mr. Miller does not believe that he should receive a two-level increase given "the nature of [his] participation in the commissioning of the offense," which clearly shows that he was neither a "leader" nor an "organizer" of the "criminal activity" with the meaning of § 3B1.1(c).

Mr. Miller asks, therefore, that the Court *not* apply a two-level enhancement under U.S.S.G. § 3B1.1(c). Based on this adjustment to the Probation Officer's analysis and recommendation, the Total Offense Level Calculation on Page 43 of the Report should yield a total offense level of no more than 10, which falls within the applicable guideline range of Zone B in the Sentencing Table.

Applying U.S.S.G. § 5B1.1, the factors set forth in 18 U.S.C. § 3553(a), and other controlling statutes, Mr. Miller submits that a proper sentence would be to impose probation for a period of twelve (12) months, including home confinement for no longer than three (3) months.

## IV. Time and Witnesses.

Mr. Miller intends to offer brief testimony in support of the requested sentences as set forth in this memorandum. Mr. Miller believes that the sentencing hearing should take no longer than forty-five (45) minutes.

Respectfully submitted,

BRIAN SCOTT MILLER

By Counsel

*s/ Mychal S. Schulz*
Mychal S. Schulz (WVSB ID No. 6092)
Christopher B. Power (WVSB ID No. 4286)
BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.
300 Summers Street, Suite 1000
Charleston WV 25301
681-205-8888
681-205-8814 (fax)
mschulz@babstcalland.com
cpower@babstcalland.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

**UNITED STATES OF AMERICA,**

v.                                **CRIMINAL ACTION NO. 2:18-cr-00077**

**BRIAN SCOTT MILLER.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of October, 2018, I electronically filed the foregoing **PRESENTENCE MEMORANDUM OF DEFENDANT BRIAN SCOTT MILLER** with the Clerk of the Court via the CM/ECF system which will send notification of such filing to the parties of record.

                                                    *s/ Mychal S. Schulz*
                                                    Mychal S. Schulz (WVSB ID No. 6092)
                                                    Christopher B. Power (WVSB ID No. 4286)
                                                    BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.
                                                    300 Summers Street Suite 1000
                                                    Charleston WV 25301
                                                    681-205-8888
                                                    681-205-8814 (fax)
                                                    mschulz@babstcalland.com
                                                    cpower@babstcalland.com